IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)


IN RE INTEREST OF CHRISTOPHER D.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF CHRISTOPHER D., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BRIAN D., APPELLANT.


Filed June 24, 2025.    No. A-24-812.


Appeal from the County Court for Box Butte County: AARON J. CONN, Judge. Affirmed.

Stacy C. Bach, of Nossaman Petitt Law Firm, P.C., L.L.O., for appellant.

Marissa L. Curtiss, Box Butte County Attorney, for appellee.


PIRTLE, BISHOP, and WELCH, Judges.

PIRTLE, Judge.

### INTRODUCTION

In October 2024, the county court for Box Butte County, sitting as a juvenile court, issued an order terminating Brian D.'s parental rights to his son, Christopher D. Brian now appeals that order. For the reasons that follow, we affirm.

### BACKGROUND

#### FACTUAL BACKGROUND

Brian married Dannell D. in 2015, and they had one child together, Christopher. However, in January 2017, 3 months before Christopher was born, Dannell moved out of their shared apartment while Brian was away on a work trip. Brian did not know where Dannell went and was subsequently denied access to Christopher, who was born in April 2017. As of the date of these

- 1 -

proceedings, Brian has still never met Christopher in person. Although Brian and Dannell had not been in a relationship since 2017, they did not finalize their divorce until January 2023.

In January 2022, the Nebraska Department of Health and Human Services (DHHS) began providing voluntary services to Dannell due to concerns that she was neglecting Christopher. Around this time, Dannell was struggling with her mental health and had left Christopher in the care of strangers. Over the next 6 months, while Dannell received voluntary services from DHHS, concerns were raised that Christopher was potentially being physically and sexually abused. Providers also witnessed Dannell struggle to parent Christopher during sessions and became increasingly concerned about her mental health.

On June 30, 2022, the State filed a petition and application for an ex parte order against both parents, with specific allegations of neglect by Dannell. The same day, the court granted an ex parte order removing Christopher from Dannell's home and placing him in the temporary care of DHHS. Christopher has remained in DHHS custody ever since. Brian's first appearance occurred on August 2, 2022. On August 4, during a subsequent hearing, the court appointed him an attorney.

On October 11, 2022, the State filed an amended petition that made specific allegations regarding Brian's inability to care for Christopher. Specifically, the amended petition alleged that Christopher lacked proper parental care; that Brian was unable to provide proper or necessary subsistence, education, or other care necessary for Christopher's health, morals, or well-being; that Brian was unable to provide special care made necessary by Christopher's mental condition; and that Christopher was in a situation that posed risks to his health or morals.

On the same day, the court held a hearing where Brian pled no contest to the amended petition. The court then adjudicated Christopher as being within the meaning of Neb. Rev. Stat. § 43-247(3)(A) (Reissue 2016). Following the adjudication, Brian began working with DHHS with a primary goal of reunifying him with Christopher and a secondary goal of adoption. To achieve these goals, Brian was supposed to learn about Christopher's medical needs, become financially stable, and be able to provide a safe and stable home free from drug use and violence. Additionally, it was recommended that Brian enroll in individual therapy, participate in family therapy with Christopher, have regular contact with case workers, and complete a parenting class.

From October 2022 until December 2023, Brian sought to achieve his case plan goals. However, due to minimal progress being made during that time, on December 13, 2023, the State filed a motion to terminate his and Dannell's parental rights. On January 4, 2024, Brian entered a denial to the petition and the court appointed him a guardian ad litem. On April 25, Dannell agreed to relinquish her parental rights to Christopher. A termination hearing was scheduled for Brian, which was eventually held on August 16, 2024.

TERMINATION HEARING

Five witnesses testified at the termination hearing. The first witness was Lori Rodriquez-Fletcher, a therapist who began seeing Christopher in June 2022 and eventually worked with Brian later that August. In her work with Christopher, Rodriquez-Fletcher diagnosed him with post-traumatic stress disorder (PTSD); unspecified neurodevelopment disorder; exposure to psychotropic medications, nicotine, and illegal substances in utero; exposure to early childhood trauma; exposure to adverse childhood experiences such as emotional, psychological, and physical

abuse; exposure to chronic parental mental health; abandonment by father; exposure to multiple parental relationships; and previous homelessness. Rodriquez-Fletcher explained that Christopher was involved in speech therapy, occupational therapy, and physical therapy, struggled to form relationships with other males, and often became verbally and physically aggressive. Because of his traumatic past, she discussed how it was important that whoever cared for Christopher understand his medical conditions and be able to address his needs.

Rodriquez-Fletcher's work with Brian involved parent-only sessions of child-parent psychotherapy. She stated that because Brian had never met Christopher, and therefore had no relationship with him, she needed to assess his motivation, willingness, and safety risks before involving Christopher in the sessions. However, over the course of six sessions, Brian made minimal progress. Rodriquez-Fletcher stated that Brian was disengaged, did not understand why he could not just meet Christopher, displayed issues with his temper, and struggled with emotional regulation. Additionally, although Brian completed an 8-week parenting course and a parenting evaluation, he did not pursue individual therapy as recommended or participate in Christopher's school meetings. Rodriquez-Fletcher was also concerned that Brian claimed to not have any legal issues when he had been previously arrested and put on probation. After working with him for 6 months, Rodriquez-Fletcher discharged Brian in November 2022 and concluded that he made minimal to no progress in establishing a relationship with Christopher.

Holly Burns, a therapist who worked with Christopher and Brian after Rodriquez-Fletcher, also testified. She first discussed Christopher's diagnoses and how they impacted his development. She diagnosed him with PTSD-chronic, ADHD, combined presentation, disorganized attachment disorder, adjustment disorder with mixed emotions and behaviors, and autism. Burns stated that due to his disorders, Christopher had trouble controlling his emotions and often had violent outbursts. He also struggled with his motor skills, recognizing emotions, and identifying numbers and colors. Additionally, Christopher was more prone to self-isolation, depersonalization, sleep problems, inappropriate emotions, and panic attacks. Because of these issues, Burns stated that it was crucial for Christopher to have structure and a consistent, predictable routine.

Burns first met Brian in December 2022 during a family team meeting. At this meeting, Burns told Brian that it was important for him to establish a relationship with Christopher. Because he had never met Christopher, she encouraged him to introduce himself by sending monthly texts, emails, or letters. Despite this recommendation, Burns testified that Brian only sent Christopher four letters from March 2023 to April 2024 and a single Christmas gift package. She also noted that Brian never attended any of Christopher's school meetings or contacted her outside of the family team meetings. Burns testified that throughout the 2 years she worked with Brian, he made "very minimal progress" in forming a relationship with Christopher.

Burns also discussed multiple evaluations that Brian completed. He completed a substance abuse evaluation in March 2023, a psychological evaluation that June, and underwent an autism evaluation that October. While it was determined that Brian did not have any problems with substance abuse, his psychological evaluation concluded that he lacked the ability to safely and appropriately parent Christopher. The evaluation noted that Brian was very defensive when addressing his own personal deficits, gave false answers in "attempts to appear good," dismissed any concerns regarding his parenting skills, was unwilling to make any life changes, lacked perspective and insight into Christopher's developmental needs, and demonstrated an inability to

respond appropriately in the moment. With this, the evaluation determined that Christopher would be at risk if placed in Brian's care. Additionally, Brian's autism evaluation reported that his IQ was in the "Very Low Average/Borderline Range" and that he displayed behaviors consistent with autism. Due to his low scores, the report noted that Brian may struggle to solve problems related to independent adult living. Due to Brian's inability to safely care for Christopher and Christopher's unique developmental deficits, Burns believed that his interests were best served by remaining in his current placement.

Haley Russel also testified. She is a family support worker who was assigned to assist Brian in July 2022. However, due to problems contacting him, she did not start working with Brian until August. Russel primarily helped Brian maintain stable housing, develop a support system, learn to budget, improve his parenting skills, and form a relationship with Christopher. Russel stated that throughout her time working with him, Brian made minimal progress on these goals.

Russel discussed Brian's issues with maintaining safe housing. While he and his wife had moved to more suitable housing and furnished a bedroom for Christopher, there were several occasions when Brian's wife contacted Russel to complain about the way he was treating her. She also called on one occasion to report that a relative had sexually assaulted her in their home. These incidents raised obvious safety concerns. Russel also noted that Brian struggled to keep his house consistently clean. Due to the physical and sanitary risks associated with Brian's home, Russel stated that he had made "very minimal" progress when it came to creating a safe environment for Christopher.

Russel also discussed Brian's attempts to form a relationship with Christopher. She explained that Brian was supposed to send him texts, emails, or letters at least once a week. But although Russel helped him find the correct addresses and mail the letters, Brian only sent four letters over a nearly 2-year period. Russel said that Brian never initiated the sending of the letters and never demonstrated the motivation to send them on his own. She also reported that Brian had not made much progress in learning how to parent a child with special needs. She was particularly concerned that Brian claimed to know how to parent a child with disabilities, when he had no prior parenting experience.

Brianna Bird also testified. She works for DHHS and became Christopher's case worker in April 2024. She was the fourth case worker assigned to his case since DHHS first intervened in January 2022. Bird testified that Christopher was removed from his mother's home on June 30, 2022, and therefore had been in an out-of-home placement for 25 months. She stated that the overarching goals for Brian were for him to learn about and understand Christopher's mental, educational, and medicinal needs and be able to provide a safe and stable home. Bird discussed several strategies that DHHS had recommended for Brian to achieve these goals. She stated that it was recommended for Brian to complete a parenting class, participate in individual and family therapy, and work with Christopher's therapist to learn about his developmental needs. Of these goals, the only one that Brian accomplished was to complete a parenting class. Bird stated that he never enrolled in individual therapy, never progressed past parent-only family therapy sessions, and failed to consistently work with Christopher's therapists. Bird testified that Brian's lack of progress was very concerning, particularly as it related to forming a relationship with Christopher.

Bird also testified that Brian never participated in Christopher's education planning sessions, was unable to provide a home free from violence, and struggled to maintain financial

stability. She was particularly concerned that Brian and his wife had ten prior law enforcement encounters related to domestic violence and that Brian had been previously convicted of crimes related to domestic violence. Bird discussed how these concerns led to Brian failing an ICPC home study, which is required when a state ward seeks to move out-of-state. The home study cited potential issues related to domestic violence, prior law enforcement involvement, financial instability, and the safety and cleanliness of the home. When Bird attempted to discuss these concerns with Brian, she said that he got upset and threatened to kill himself if his parental rights were terminated. Brian's criminal history and aggressive behavior led Bird to believe that he was not emotionally stable.

Due to these concerns, Bird did not believe that Brian was able to meet Christopher's needs and had unrealistic expectations of what parenting a child with severe developmental needs would be like. She described how he did not demonstrate an understanding of Christopher's therapeutic, developmental, or medical needs and thought he could safely parent him without making any changes to his own life. Given Brian's lack of progress on his case plan goals, the extended duration of the case, his unwillingness to make meaningful changes, his limited understanding of Christopher's overall needs, his history of failing to act as a protective parent to Christopher, and Christopher's need for permanency, Bird believed that terminating Brian's parental rights was in Christopher's best interests. She also noted that even if Brian's parental rights were not terminated, it was unclear whether Christopher would ever be allowed to live with him due to the failed ICPC home study.

Brian was the final witness to testify. He stated that he currently lives in Wyoming with his wife in a two bedroom apartment. Brian discussed his other son from a prior relationship and how he has never parented this child or formed a relationship with him. He also explained how he had never met Christopher because Dannell left while still pregnant and subsequently denied him access. During the remainder of his testimony, he mostly blamed others for his lack of relationship with Christopher. He talked about how difficult it was to contact anyone from DHHS because there had been four case workers assigned to his case since it was first opened. He then discussed how the therapists never allowed him to meet Christopher and how he never received the correct paperwork to contact his school or other providers. Similarly, he claimed that he did not communicate with Christopher beyond the four letters and gift package because he did not have an accurate address.

Brian then talked about his criminal history. He stated that he had been arrested three times since 2022. While the details of these arrests were not clear, he claimed all three were in relation to traffic citations. He also mentioned that he was previously on probation, which was revoked in 2020. However, no details were provided regarding the reason he was on probation or why it was revoked.

JUVENILE COURT'S ORDER

On October 1, 2024, the juvenile court issued an order terminating Brian's parental rights. The court generally found that Brian had made minimal efforts to establish a relationship with Christopher and failed to put himself in a position where Christopher would be safe in his care. Additionally, the court determined that Brian's testimony was not credible to the extent that he attempted to blame others for his lack of communication with Christopher. The court stated that

despite having the correct addresses and contact information, Brian did not meaningfully attempt to establish a relationship with his son. As a result, the court determined the State proved by clear and convincing evidence that the requirements of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) were met and that terminating Brian's parental rights was in Christopher's best interests.

Brian now appeals.

## ASSIGNMENT OF ERROR

Restated, Brian assigns that the juvenile court erred in terminating his parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of facts over the other. *In re Interest of Jeovani H.*, 316 Neb. 723, 6 N.W.3d 539 (2024).

## ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interests. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

### STATUTORY GROUNDS

There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id.*

Brian does not contest that a statutory ground was met to terminate his parental rights under § 43-292. However, for the sake of completeness, we conclude that the statutory ground under § 43-292(7) was met. Subsection (7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

The evidence demonstrated that Christopher was removed from Dannell's home on June 30, 2022, and had been in DHHS custody ever since. Accordingly, when the motion to terminate Brian's parental rights was filed in December 2023, he had been in an out-of-home placement for 18 months. Therefore, we determine that the State proved by clear and convincing evidence that Christopher had been in an out-of-home placement for 15 or more months of the most recent 22 months when it filed the motion to terminate Brian's parental rights.

### BEST INTERESTS AND UNFITNESS

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This

presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Last minute attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *Id.*

Upon our de novo review, we conclude that the State proved by clear and convincing evidence that terminating Brian's parental rights was in Christopher's best interests. The record demonstrates that Brian was unmotivated to form a relationship with Christopher, unable to understand the realities of parenting a child with severe developmental needs, and unwilling to make the life changes necessary to care for a child with such needs. More so, Brian proved incapable of providing a clean home free of violence.

It is undisputed that Brian has never met Christopher and does not have any sort of meaningful relationship with him. While Brian asserts that his lack of a relationship with Christopher was due to DHHS never allowing him an in-person meeting, the evidence demonstrates that Brian could have progressed to meeting Christopher if he had put forth more effort. Both Rodriquez-Fletcher and Bird discussed how Brian never progressed past parent-only family therapy sessions because he failed to consistently correspond with Christopher. Although it was recommended that he communicate with Christopher monthly, he only sent him four letters and one gift package over a nearly 2-year period. And as articulated by Russel, Brian never initiated the sending of those letters and required significant help to do so. Brian's lack of motivation to form a relationship with Christopher and his failure to understand the importance of doing so is telling. His refusal to complete such a basic requirement highlights a fundamental misunderstanding of what is necessary to parent a child.

Beyond his lack of a relationship with Christopher, Brian also displayed a lack of understanding or an inability to understand the unique challenges posed by Christopher's therapeutic, educational, and medicinal needs. Throughout the pendency of this case, Christopher was diagnosed with PTSD; ADHD; disorganized attachment disorder; adjustment disorder with mixed emotions and behaviors; unspecified neurodevelopment disorder; exposure to psychotropic medications, nicotine, and illegal substances in utero; exposure to early childhood trauma; exposure to adverse childhood experiences such as emotional, psychological, and physical abuse; exposure to chronic parental mental health; abandonment by father; exposure to multiple parental relationships; previous homelessness; and autism. He also struggled with his motor skills, forming relationships, controlling his emotions, identifying numbers and colors, and violent outbursts. As

a result of these developmental issues, Christopher was enrolled in individual therapy, speech therapy, occupational therapy, and physical therapy. Despite all this, it was consistently reported that Brian did not believe he needed to make any changes in his own life to parent Christopher. This demonstrates that Brian did not fully grasp Christopher's developmental needs and carried an unrealistic view of what parenting Christopher would entail. This mindset posed serious risks to Christopher because it showed that Brian was unprepared to provide the consistency, structure, and support required to meet his developmental needs.

Brian was also unable to provide a stable, clean, and safe home for Christopher. Beyond the cleanliness issues, there were multiple reports of violence in the home. Russel testified that Brian's wife contacted her multiple times to report that Brian was "being mean" and once reported that he had hit her. On another occasion, she reported to Russel that a relative had sexually assaulted her in the home. There were also concerns related to Brian's criminal history and law enforcement being called ten times due to potential domestic violence. Although the record did not provide any details regarding Brian's prior convictions, his history of domestic violence was severe enough to fail the ICPC home study. More so, there were multiple reports that Brian struggled to maintain his temper.

With all these problems, it was determined that Brian lacked the necessary skills to safely parent Christopher. Because Brian did not believe he needed to make any life changes, did not understand Christopher's needs, and had no prior parenting experience despite having another child, his psychological evaluation concluded that he lacked the minimal abilities to appropriately care for Christopher. This sentiment was echoed by Bird who stated that Brian needed to make significant changes if he were to care for Christopher but had not shown any willingness to do so.

Accordingly, due to Brian's lack of effort in forming a relationship with Christopher over a 2-year period, his lack of parenting experience, his demonstrated inability to understand the realities of parenting a child with developmental needs, his inability to provide safe and stable housing, and his inability to safely parent Christopher, we determine there was clear and convincing evidence to show that Brian was unfit to parent Christopher. We also determine that because he has failed to demonstrate meaningful improvement in these areas over the course of 2 years, it is unlikely he will make any improvements within a reasonable period of time. Therefore, because Christopher should not be suspended in foster care to await Brian's uncertain parental maturity, we conclude the State proved by clear and convincing evidence that terminating his parental rights was in Christopher's best interests.

## CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds to terminate Brian's parental rights existed under § 43-292(7), and that terminating his parental rights was in Christopher's best interests.

AFFIRMED.